357 P.2d 190

Jesse **J. LEAVITT** and Phoebe Leavitt, his wife, Plaintiffs and Appellants,

v.

**Eleanor BLOHM, Defendant and Respondent,**

**Verda Lynn, Third Party Defendant.**

**No. 9153.**

Supreme Court of Utah.

Nov. 29, 1960.

Henriod and Callister, JJ., dissented.

Forrest W. Fuller, Salt Lake City, for appellants.

Glen M. Hatch, Heber, for respondent.

CROCKETT, Chief Justice.

The plaintiffs, Jesse J. and Phoebe Leavitt, assignees of a seller's interest in a contract to sell the El Rancho Motel in Heber City, Utah, sued the defendant Eleanor Blohm, assignee of the buyer's interest therein, for payments allegedly due of $3,-891.67, the defendant Blohm having vacated the property.

The trial court found against the plaintiffs and awarded Mrs. Blohm $4,855.01 on her counter-claim on the ground that the plaintiffs Leavitt had failed to fulfill their obligations under the contract, and that the defendant Blohm's payments exceeded to that extent the reasonable value of the use of the property during her occupancy. Plaintiffs appeal.

In December, 1955, Forrest and Renae Hancock executed a contract of sale of the motel to DeLoy and Stella Smith, who in August, 1956, sold and assigned the contract to I. J. Kartchner, who in the same month sold and assigned to Verda Lynn, who then sold to the defendant Eleanor Blohm in November, 1956, for which the latter gave an interest in a property in Phoenix, Arizona, recited to be worth $5,000, as a down payment, and agreed to pay $375 per month ($630 during the summer months). It is not disputed that her payments were made for the period from December, 1956, through May, 1957, and $471.67 on the June payment, after which she failed and refused to make further payments.

Meanwhile in January, 1957, Verda Lynn had assigned her seller's interest in the con-

tract to the plaintiffs Leavitt; and in April, 1957, the Hancocks, who owned the property and from whom it was being purchased by the plaintiffs' assignors, brought an action against all of the parties, including the defendant Blohm, charging default of the original contract, seeking cancellation thereof and forfeiture of payments made as liquidated damages, possession of the property, treble damages for unlawful detainer and $1,500 attorney's fees.

Before that case had proceeded to a decision, the Hancocks, on May 27, 1957, entered into a new contract to sell the property to I. J. Kartchner and Nephi Cutler, which recited that the original contract between themselves and the Smiths was forfeited, which would cut the stem through which the Leavitts were purporting to sell to Mrs. Blohm and put it out of their power to perform. However, the Leavitts take the position that they re-established their ability to perform on August 9, 1957, when the Vineyard Investment Company, a corporation in which they owned the majority of stock, purchased the May 27th contract from Kartchner and Cutler. But there are two reasons which militate against this. First, even though the Leavitts may have controlled this corporation, there was no means by which the defendant Blohm could proceed directly against it and enforce her agreement, nor could she stop it from conveying to a third party for a higher price or other reason if it had so decided.

She was entitled to look to the Leavitts, who were demanding payment from her, and was not obliged to assume nor to prove that some corporation was their alter ego, nor that they may have had something in their "back pocket" that they could bring to their aid in making title if they so desired. Second, this May 27th contract itself became in default on August 25, 1957, for failure to make payments as provided therein, and on December 13, 1957, the Hancocks again brought action against the Vineyard Investment Company and defendant, Mrs. Blohm, charging default and seeking forfeiture of the contract, possession of the premises and $1,000 attorney's fees. Shortly thereafter she vacated the property. The plaintiffs then brought this suit for payments they maintain she should have made; and she counter-claimed for the money she had paid in, less rental value during her occupancy.

Upon the basis of the facts shown in evidence the trial court stated in its memorandum decision, that the Leavitts had, " * * rendered themselves unable to perform"; and in its findings and conclusions recited the essential facts hereinabove discussed and expressly concluded, " * * * that inasmuch as the plaintiffs and their predecessors in title defaulted in their obligation to the Hancocks and the Hancocks declared such contract forfeited, brought suit for eviction against the defendant * * * this constituted such a breach of the contract as

entitled the defendant to recover \* \* \*" and also that "\* \* \* plaintiffs had disabled themselves from performing their part of the contract and that this breach of contract relieved the defendant from any further obligation to make payments on said contract."

In considering the soundness of the judgment, we acknowledge our accord with the rule relied upon by the plaintiffs that the vendor in a real estate contract is generally not obliged to have full and clear marketable title at all times during the pendency of his contract of sale because, ordinarily, title need not be conveyed until the final payment is made or tendered;[1] and we further agree that the purchaser cannot use a claimed deficiency in title as an *excuse* for refusing to keep a commitment to purchase property, as was attempted in the case of Woodard v. Allen.[2] But we do not regard the facts presented here as coming within those principles.

It is to be kept in mind that the obligations of such contracts run both ways. It is true that if the buyer fails to make his payments he cannot enforce his rights. By the same token, if the seller fails to meet his commitment he likewise cannot expect the buyer to perform. An important attribute

of the ownership of real property, and one of the things for which Mrs. Blohm was paying, was the right to the quiet and peaceable enjoyment of it. She had a right to look to the Leavitts not to leave her vulnerable to being disturbed therein. Her responsibility to make payments to them was dependent upon their fulfillment of this duty to her. The fact is that the Leavitts had attempted abortively to bring their contract into good standing, but had failed. Mrs. Blohm knew that unless the Leavitts made their payments she was exposed to the risk of a judgment in the suit by the Hancocks, not only for possession of the property, but also for treble damages and substantial attorney's fees. Thus it can hardly be said that she was being accorded the peaceable use and enjoyment of the property.

We see no impropriety in the trial court's view that where the Leavitts had permitted their interest in the property to become involved in such a way that the buyer did not have the quiet and peaceable enjoyment of it, coupled with the further fact that the circumstances justified forebodings that they would not be able to extricate themselves from their difficulties and be in a position to convey title, she was not obliged to continue payments,[3] but could

1. See Woodard v. Allen, 1 Utah 2d 220, 265 P.2d 398; see also 55 Am.Jur. 994.
2. Ibid.
3. See Tremonton Inv. Co. v. Horne, 59 Utah 156, 202 P. 547; Giarratano v.

McIlwain, 1926, 215 App.Div. 644, 214 N.Y.S. 582; Annotation at 109 A.L.R. 242, et seq.; 55 Am.Jur. 994; 59 A.L.R. 250.

take such measures as seemed necessary and prudent to protect herself.

██ The effect of such determination was to recognize her right to regard the contract as breached by the Leavitts and to justify her refusal to perform. This in effect was a rescission of the contract. Under usual circumstances we would agree with the trial court's view that the parties should be restored to status quo by charging Mrs. Blohm with the reasonable rental value of the property during her occupancy, crediting her with payments she had made, and giving her judgment for the difference on her counter-claim.[4] But a court should not so decree where it appears unfair and inequitable to do so.

█ Even though it be correct that because of the Leavitts' failures Mrs. Blohm should not be subjected to a judgment for not making payments, under the particular facts here shown, it seems unjust to grant her an award against the Leavitts on her counter-claim. In the first place, the record does not show that they received any beneft from the original down payment Mrs. Blohm had made to Mrs. Lynn by the transfer of the equity in the property at Phoenix, Arizona. Although it is recited to be worth $5,000.00, there is some question about its actual value. In the second place, conceding that difficulties existed which justified her in not making further payments to the Leavitts at that time, it does not appear that Mrs. Blohm did anything by way of offering to place her payments in escrow or making any other effort to perform, but simply informed the Leavitts that she would make no further payments until the matter was "straightened out." She continued so to remain in the property until after the Hancocks brought the second suit against the Leavitts, joining her as a defendant. Her attorney advised her that there was no defense and she moved out in January, having made an agreement to do so with the Hancocks as a condition to the dismissal of the suit against her.

Meanwhile Mrs. Blohm had not offered to return the property to the Leavitts, nor asserted any claim against them for the return of her money, which she should have done promptly if she had relied strictly upon the right of rescission. In fact she made no claim for the return of the money she had paid until the filing of her counter-claim. The effect of her conduct appears to have been to treat the contract as abandoned. It should be so regarded and she should not be permitted to "resurrect" and assert such a claim in this suit.

We think that the award on the counter-claim should be excised from the judgment, and in other respects it should be affirmed. Such is the order. The parties to bear their own costs.

4. See McKellar Real Est. & Inv. Co. v. Paxton, 62 Utah 97, 218 P. 128; 17 C.J.S. Contracts § 438, p. 919.

WADE and McDONOUGH, JJ., concur.

CALLISTER, J., dissents.

HENRIOD, Justice (dissenting).

I dissent, suggesting that the main opinion not only confuses legal and equitable principles, as will appear from a cursory reading thereof, but also misconstrues the facts. Its conclusion is based on the assumption that the Leavitts had a duty to convey to Blohm, which is not so. That aspect of this case will be discussed later.

Reduced to the bone, Lynn, under a uniform real estate contract dated November 10, 1956, agreed *"to sell and convey"* the property to Blohm, *when and if the latter made all payments called for under the contract.*[1] On January 10, 1957, by written *assignment,* Lynn *assigned* her interest in the contract to Leavitts. She warranted that the balance due thereunder was $9,000. The duty ultimately to convey remained in Lynn. The assignment of the balance due imposed no obligation whatever on the Leavitts to convey. It *did* impose an obligation on the part of Blohm, who had notice of the assignment, to pay the balance due to Leavitts, all in consonance with simple assignment principles.

It is true that the Leavitts made several gestures to prevent termination of the Lynn-Blohm contract, obviously to secure payment to them of the balance due thereon, which they had bought and paid for. But the obligation to convey to Blohm persisted in Lynn, who, for some unknown reason, was dropped from this litigation.

The main opinion's analysis of the facts is inaccurate. The statements about the duty of both parties to a contract to perform is Hornbook. Speaking of a seller's duty to give peaceable possession, also Hornbook, is inapplicable here since it was Lynn's, not the Leavitts' duty to insure such peaceable possession. The main opinion concedes that the Leavitts were *"assignees of a seller's interest* in a contract to sell the El Rancho" and that "in January, 1957, Verda Lynn had *assigned her seller's interest* in the contract to Leavitts." Being so, it is inescapable that under elementary principles the Leavitts, assignees for good and valuable consideration, were entitled to collect such balance. This should end the matter, but assuming, as does the main opinion, that the Leavitts had some kind of duty to convey to Blohm when and if all payments were made, and simply in answer to such assumed fact, the following circumstances prevail:

One Hancock originally owned the property. A series of uniform real estate contracts culminated in Lynn's becoming the equitable owner. She sold the property to Blohm under a uniform real estate contract.

1. Woodard v. Allen, 1 Utah 2d 220, 265 P.2d 398.

Leavitts rendered $1,500 to Hancock, obviously to stave off a possible termination of the Lynn-Blohm contract. Hancock would not accept, claiming $2,400 to make current the obligations of his privies.

When Blohm refused to make any more payments in June, 1957, Leavitts had the assignment from Lynn. Before this, in March, 1957, they had made the unsuccessful $1,500 tender to Hancock. On May 27, 1957, prior to Blohm's refusal to pay, Hancock signed a contract covering the property with one Kartchner, who transferred his interest to Vineyard Investment in August, 1957. This company obviously was the alter ego of the Leavitts who owned all the stock except a couple of shares. Equally obvious at that juncture was the fact that Leavitts had it within their absolute power to acquire title to the motel. Nonetheless, Blohm still refused to pay anything on the assignment during the ensuing five months. Hardly could it be said that Leavitts had made it impossible for them to convey title which need not have been conveyed under the terms of the contract by anyone until at least 15 years hence. Blohm abandoned the property in January, 1958. At that time Leavitts still had the right to acquire title to the motel by virtue of the Vineyard contract, which actually was assigned to them early in 1958. Even after Leavitts had started suit, it was made clear in Mr. Leavitt's deposition, that he was not averse to clearing delinquencies amounting to about $2,500. It is only reasonable to conclude that his willingness to clear the way for acquisition of title, then within his power, was contingent upon a similar willingness on the part of Blohm to perform her agreement to buy the motel, which she refused to do.

Defendant urges that 1) Leavitts had put it beyond their power to acquire title and that therefore 2) she had a right to rescind. The trial court went along.

As to 1): Defendant's chart set forth in her own brief shows the accuracy of what has been set forth above. It indicates clearly that except for a very brief period the Leavitts had the ability to procure title and deliver it to Blohm, if and when the latter performed the terms of the Lynn-Blohm agreement. But she refused to make further payments in June, 1957. In August the Leavitts were parties to an agreement that could have resulted in the obtaining of good title to the motel. Nonetheless, Blohm refused to make payments for the next five months. She then abandoned the property. To say Leavitts had put it beyond their power to obtain title is unrealistic completely, and is contrary to the undisputed chronology of events reflected in defendant's own chart. Under such circumstances it seems clear that there was no meritorious right of rescission, even assuming a duty on the part of Leavitts to convey. Woodard v. Allen, supra, would seem to be controlling.

As to 2): Assuming, arguendo, that Blohm *might* have had a right of rescission, most assuredly she asserted it too slowly. She remained in possession of the motel for six and one-half months after any such right might have accrued. She did not tender that which she should have tendered in return to assert such right effectively, consisting of any motel income and the reasonable rental value for her own occupancy.[2]

Plaintiffs clearly are entitled to judgment for the delinquencies.

Callister and McDonough, JJ., dissented.